# IN THE
# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| EARL KELLY (A-90881), ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 11 C 1283 |
| ) | |
| ) | Judge John W. Darrah |
| DR. PARTHA GHOSH, et al. ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Earl Kelly (hereinafter, "Plaintiff") is an inmate incarcerated at the Stateville Correctional Center. He filed this 42 U.S.C. § 1983 action against Stateville physicians Dr. Partha Ghosh, Dr. Liping Zhang, and Physician's Assistant Latonya Williams and against Stateville former Warden Marcus Hardy and Assistant Warden Kenneth Osborne. Plaintiff asserts that he injured his shoulder (dislocated it) while playing basketball on March 9, 2012; he may have reinjured it on April 15, 2010, when he was knocked down while standing on the sidelines, watching a basketball game. The Stateville physicians allegedly provided inadequate treatment for not reducing the shoulder back into its socket and for not sending him sooner to an outside orthopaedic specialist; and Hardy and Osborne allegedly ignored Plaintiff's complaints that the doctors were providing inadequate care. Plaintiff was examined by a University of Illinois, Chicago orthopedist in September 2010, at which time surgery to reduce the shoulder was scheduled for October 11, 2010. Two motions for summary judgment are pending currently: one filed by Dr. Ghosh, Dr. Zhang, and Latonya Williams; the other filed by Warden Hardy and Assistant Warden Osborne. Plaintiff has responded to both motions. For the following reasons, both motions are granted, and the case is dismissed.

## LEGAL STANDARD

### Rule 56 of the Federal Rules of Civil Procedure

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In determining whether factual issues exist, a court must view all the evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *Weber v. Universities Research Assoc., Inc.*, 621 F.3d 589, 592 (7th Cir. 2010). A court does not "judge the credibility of the witnesses, evaluate the weight of the evidence, or determine the truth of the matter. The only question is whether there is a genuine issue of [material] fact." *Gonzalez v. City of Elgin*, 578 F.3d 526, 529 (7th Cir. 2009), *citing Anderson v. Liberty Lobby*, 477 U.S. 242, 249-50 (1986).

Rule 56(a), however, "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. If the moving party meets its burden of showing that there are no issues of material fact and that he is entitled to a judgment as a mater of law, the non-moving party must "go beyond the pleadings and affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact." *Borello v. Allison*, 446 F.3d 742, 748 (7th Cir. 2006) (internal quotes and citations omitted). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Egonmwan v. Cook County Sheriff's Dept.*, 602 F.3d 845, 849 (7th Cir. 2010) (citation omitted); *see also Carrroll v. Merrill Lynch*, 698 F.3d 561, 564-65 (7th Cir. 2012) (a nonmovant

cannot rely upon "some metaphysical doubt" about the validity of evidence, and "inferences supported by only speculation or conjecture do not create a genuine issues of fact") (citation omitted).

*Rule 56.1 of the Local Rules of the Northern District of Illinois*

When addressing a summary judgment motion, background facts are derived from the parties' Local Rule 56.1 Statements, which directs the parties to "organiz[e] the evidence, identify[] undisputed facts, and demonstrat[e] precisely how each side propose[s] to prove a disputed fact with admissible evidence." *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 527 (7th Cir. 2000). Because Plaintiff is proceeding *pro se*, Defendants served him with a "Notice to Pro Se Litigant Opposing Motion for Summary Judgment" as required by N.D. Ill. Local Rule 56.2, which explains the consequences of failing to properly respond to a motion for summary judgment and to facts stated in Defendant's Local Rule 56.1 Statement. (R. 71, 76, Defendants' Notice to Pro Se Litigants Opposing Summary Judgment.) A litigant's failure to respond to a statement of fact in a Local Rule 56.1 Statement results in the uncontroverted statement being considered admitted. *Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006).

In the present case, Defendants filed Rule 56.1 Statements, (R. 69, 75.), and forwarded Rule 56.2 Notices to Plaintiff. (R. 71, 76.)[1] The bulk of the evidence presented include medical records, Dr. Ghosh's and Physician Assistant Williams' affidavits discussing both their treatment and Dr. Zhang's Progress Notes, correspondence and grievances forwarded to Warden Hardy and Assistant

---

[1] Defendants complied with Local Rule 56.2, which requires a party to provide Notice to a Pro Se Litigant Opposing Summary Judgment. (R. 71, 76.) Local Rule 56.2 instructs the *pro se* litigant how to respond to a motion for summary judgment and its corresponding Rule 56.1 Statement of Material Facts.

Warden Osborne, and Plaintiff's deposition.  Plaintiff has responded to both of Defendants' Rule 56.1 Statements.  Plaintiff objects to most of Defendants' factual statements and includes his own affidavit, correspondence to the wardens from both himself and his criminal defense attorney, and an affidavit from a fellow inmate, addressing some of the facts stated by Defendants.  (R. 82, 83.)  With the above-stated standards in mind, the Court considers the evidence of this case.

## BACKGROUND

*Dr. Ghosh, Dr. Zhang, and Physician's Assistant Williams*

On March 9, 2010, Plaintiff dislocated his shoulder while playing basketball at Stateville. (R. 69, Defs. SOF ¶ 3; R. 83 Pl. SOF ¶ 3.)  Dr. Zhang examined Plaintiff that day.  (*Id.*)  The parties disagree as to the treatment Plaintiff received at that time.  According to Defendants and medical records, Dr. Zhang reduced Plaintiff's shoulder back into place, found a full range of motion, and found no edema or deformity.  (R. 69, Defs. SOF ¶ 4; *see also* Exh. A, Progress Notes Entry 3/9/10 states "left shoulder reduction made, no marked deformity, . . . no edema, range of motion full, . . . left shoulder strain.")  Dr. Zhang ordered x-rays, prescribed Motrin, and told Plaintiff to return to see her in two weeks.  (Progress Notes Entry 3/9/10.)  According to Plaintiff, Dr. Zhang did not reduce the shoulder back into place; the shoulder was visibly deformed because it was still out of place, and Dr. Zhang admitted that she was not a "bone specialist."  (R. 83, Pl. SOF ¶ 4.)

Dr. Zhang saw Plaintiff two weeks later.  According to Dr. Zhang, on March 22, 2010, Plaintiff had a full range of motion and no local tenderness.  (R. 69, Defs. SOF ¶¶ 7, 8.)  The x-ray of Plaintiff's shoulder was not available that day, and Dr. Zhang scheduled another appointment and increased Plaintiff's pain medication.  (*Id.* at ¶¶ 9, 10.)  Dr. Zhang next saw Plaintiff on March 24, 2010, at which time she reviewed the x-ray from March 15, 2010.  (*Id.* at ¶¶ 11, 12.)  Plaintiff's x-

ray was negative. (*Id.* at ¶ 11; *see also* Exh. A, March 15, 2010, x-ray report.) The Progress Notes state Dr. Zhang prescribed a range of motion exercise, recommended reduced weight lifting, and told Plaintiff to return as needed. (R. 69, Defs. SOF ¶13; *see also* Exh. A, Progress Note Entry of 3/24/10.)

According to Plaintiff, he saw Dr. Zhang on March 23 and 24, 2010, but not on March 22. (R. 75, Exh. D, Pl. Depo. at 36, 38-39.) Plaintiff states that, on March 24th, he saw Dr. Zhang but that "he did not receive treatment by Defendant Zhang" because she "already admitted that she was not a 'bone specialist.'" (R. 83, Pl. SOF ¶ 12.) Plaintiff contends that an MRI should have been ordered once his x-ray came back negative. (*Id.* at ¶ 11.)

On April 2, 2010, Dr. Zhang again examined Plaintiff, noted no acute changes and that she planned to discuss Plaintiff's condition with Dr. Ghosh, Stateville's Medical Director. (R. 69, Defs. SOF ¶ 14.) Again, Plaintiff acknowledges that he saw Dr. Zhang on April 2, 2010, but states that she did not treat him because she was not a "bone specialist." (R. 83, Pl. SOF ¶ 14.)

On April 15, 2010, Plaintiff saw Physician's Assistant Latonya Williams after again being knocked down on or near the prison's basketball court. The parties dispute how the incident occurred. According to Williams and the medical records, Plaintiff presented himself to Williams on April 15, 2010, with a new shoulder injury he sustained playing basketball. (R. 69, Defs. SOF ¶¶ 15-17, citing Exh. B, Williams Aff. ¶¶ 4-5; *see also* Exh. A, Progress Notes Entry for 4/15/10 wherein Williams describes how Plaintiff sustained an injury on 4/15 when he was blocked going up for a shot.) Williams states she prescribed 800 milligrams of Motrin and told Plaintiff that she would discuss his shoulder condition with Drs. Ghosh and Zhang. (*Id.* at ¶ 18.) Williams ordered another x-ray of Plaintiff's shoulder, which was taken on April 27, 2010. (*Id.* at ¶ 19.) An x-ray

report from April 27th showed "apparent mild separation of AC joint, otherwise negative." (*Id.* at ¶ 20; *see also* Exh. A, p. 13, copy of 4/27/10 x-ray report.)

Plaintiff denies he told Williams that he sustained a second sports injury. He states that he instead told Williams that he was injured while standing on the sidelines. (R. 83, Pl. SOF ¶¶ 15-16.) According to Plaintiff, he did not discuss his shoulder injury with Williams, and it was "senseless to discuss shoulder injury with Defendants Ghosh or Zhang, neither were 'bone specialists.'" (*Id.* at ¶ 18.) Plaintiff disagrees with the x-ray report quoted above and contends that "doctors at UIC would not perform surgery for a mere 'mild separation of Plaintiff's AC joint!'" (R. 83, Pl. SOF ¶ 20.)

According to Dr. Ghosh, he examined Plaintiff on July 7, 2010, noted decreased range of motion, reviewed the most recent x-rays, prescribed Naproxen and a lower bunk permit, and recommended that Plaintiff see a UIC orthopedic specialist . (R. 69, Defs. SOF ¶¶ 22-23.) On July 12, 2010, Wexford approved Plaintiff for an orthopedic consult. (*Id.* at ¶ 24.) Plaintiff agrees that Dr. Ghosh prescribed Naproxen and a lower bunk permit and referred him for a consult but states that Dr. Ghosh did not treat him because he was not a "bone specialist." (Pl. SOF ¶¶ 21-24.)

Plaintiff was seen by an orthopedic specialist on September 10, 2010. (Defs. SOF ¶ 25.) According to a September 10, 2010 Orthopedic Note from UIC, Plaintiff told the UIC doctor about his March 9, 2010 shoulder injury and the diagnosis of AC joint separation but reported no "significant pain or stiffness." He did state, "however, [that] he [wa]s unable to lay on his left side without discomfort and is unable to work out due to pain." (*Id.* at Exh. A, p.18, 9/10/10 UIC report.) The UIC specialist noted a joint separation, a protrusion of Plaintiff's distal clavical on the left side but also noted a full range of motion and intact sensation. (*Id.* at p.18-19.) The UIC

specialist scheduled Plaintiff for surgery on October 11, 2010, for a "Weaver Dunn procedure with hamstring allograft." (*Id.* at p.19.)

Plaintiff agrees with the facts of the preceding paragraph and objects only insofar as the report indicates that he did not complain of significant pain. (Pl. SOF ¶ 25.)

Plaintiff underwent surgery on October 11, 2010. (Defs. SOF ¶ 26; Pl. SOF ¶ 26; *see also* Exh. A, p.20-22, Operative Report.)

*Warden Hardy and Assistant Warden Osborne*

Hardy and Osborne have filed a Rule 56.1 Statement separate from the doctors'. (R. 75.) Their statements 1-7 recount Plaintiff's medical history from his medical records described above, to which Plaintiff objects, again emphasizing that he never reported a second sports injury on April 15, 2010, and that Dr. Zhang and Dr. Ghosh, although they may have seen and examined him, never treated him because they were not "bone specialists." (R. 75, Defs. SOF ¶¶ 1-7; R. 82, Pl. SOF ¶¶ 1-7.) According to Hardy and Osborne, prisoners are to first attempt to resolve grievances through their counselor. If the issue is not resolved informally, the prisoner may file a grievance, which a grievance officer investigates. Grievances about medical issues are referred to the prison's Health Care Unit. (R. 75, Defs. SOF ¶¶ 8-9.) After investigation, the grievance officer's conclusions and any request for relief are submitted to the warden for decision. The warden's decision is then forwarded to the prisoner. (*Id.* at ¶ 9.) With respect to emergency grievances, prisoners submit them directly to the warden, which Hardy states is reviewed by either the warden or his designee. (*Id.* at ¶ 10); *see also* 20 Ill. Admn. Code § 504.840 (procedures for emergency grievances).

Plaintiff objects to Defendants' description of the grievance procedures, characterizing Hardy's description "self-serving" and stating that evidence from the John Howard Association indicates that "the grievance process is a joke!" (R. 82, Pl. SOF ¶ 8.)

On March 24, 2010, Plaintiff filed an emergency grievance "to produce the x-ray and to relocate my left shoulder without any more delay." (R. 75, Des. SOF ¶ 11, quoting Exh. G, 2/24/10 grievance; Pl. SOF ¶ 11.) The grievance was reviewed and marked as not an emergency on April 12, 2010, by Hardy's designee. (Defs. SOF ¶ 12; Exh. G.) The March 24, 2010 grievance was also reviewed by a grievance officer on April 13, 2010, who wrote that Plaintiff was seen by health care staff on March 22 and 24, 2010, and that Plaintiff could submit a sick-call request slip to the medical technician. (Defs. SOF ¶13; *see also* Exh. G.) Hardy contends that his designee reviewed the grievance and that Hardy had no knowledge of Plaintiff's shoulder condition. (Defs. SOF ¶14.)

According to Hardy, his alleged knowledge of Plaintiff's shoulder condition is based upon four items of communications: the March 24 emergency grievance and three letters sent to Hardy about Plaintiff's condition (one from Plaintiff on March 28, 2010, and two from his attorney Fred Cohn on April 2, 2010, and May 20, 2010). (R. 75, Defs. SOF ¶¶ 14-18; *see also* Exhs. I, J, K, copies of 3/28, 4/2, and 5/20/10 letters.) Hardy states that he never read the letters or the grievance, given that he is unable to read and review every piece of mail from prisoners because of the sheer number of them. (R. 75, Defs. SOF ¶¶ 17, 18.) Hardy further states that, even had he, himself, reviewed the grievance or letters, the medical records indicated that Plaintiff's shoulder had been reduced and that Dr. Zhang had discussed x-ray results with Plaintiff. (*Id.* at ¶ 17.)

Plaintiff disagrees that Hardy had no knowledge of his complaints, stating that Hardy is attempting a "slick way" to cover up such knowledge. (Pl. SOF ¶ 13; *see also* ¶¶ 12, 14.)

As to Assistant Warden Osborne, the parties agree that his alleged involvement is based upon two conversations with Plaintiff and one letter. The first conversation was on March 28, 2010; the next one was a few days later. The letter to Osborne was sent on March 28, 2010, just after their conversation. Plaintiff alleges he spoke to Osborne on March 28, 2010, while Osborne was visiting Plaintiff's unit. Plaintiff testified in his deposition that he showed Osborne his shoulder; Osborne commented that it did not look right, and he would make sure someone from the medical department would look at it; and Plaintiff sent Osborne a letter that day recounting their conversation. (R. 75, Defs. SOF ¶ 19; R. 82, Pl. SOF ¶19.) A few days later, when Plaintiff was at the Health Care Unit for his hypertension condition, he again saw Osborne and reminded him about his shoulder. Osborne allegedly responded he remembered Plaintiff and would talk to someone. (R. 75, Defs. SOF ¶ 19; R. 82, Pl. SOF ¶19; Exh. D, Pl's Depo. at 125-27.) Plaintiff wrote a grievance about not getting a response or an adequate response from Hardy and Osborne. Around the time Plaintiff wrote the grievance, which was around the time of his encounters with Osborne, he "was still in the process of getting the results of the x-rays and . . . following up with Dr. Zhang." (R. 75, Defs. SOF ¶ 20, Exh. D, Pl. Depo at 130-31.)

## ANALYSIS

The Eighth Amendment imposes a duty to provide adequate medical care to prisoners. *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976). A deliberate indifference claim consists of both an objective and a subjective element. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (*Farmer*). An inmate must be able to establish both: (1) that he suffered an objectively serious medical condition, and (2) that defendants acted with deliberate indifference to that condition. As to the first prong, a condition is sufficiently serious if it "has been diagnosed by a physician as mandating treatment or . .

. is so obvious that even a lay person would perceive the need for a doctor's attention." *Roe v. Elyea* 631 F.3d 843, 857-58 (7th Cir. 2011) (*Elyea*) (quoting *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005)) (*Greeno*). None of the parties address whether Plaintiff's dislocated shoulder condition was sufficiently serious. Given that his injury required treatment, was arguably obvious to a lay person as necessitating treatment, and is comparable to other injuries found sufficiently serious for Eighth Amendment purposes, *see Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007) (dislocated finger); *Ibarra v. Loftin*, No. 11-cv-681-JPG, 2012 WL 2375487, *4 (S.D.Ill. June 22, 2012) (Gilbert, J.) (dislocated shoulder), this Court will consider Plaintiff's condition sufficiently serious and will focus, as the parties do, on the second, subjective, element.

As to the second element of deliberate indifference, Plaintiff must establish that the Defendants acted with a "sufficiently culpable state of mind," i.e., that they had actual knowledge of Plaintiff's condition but disregarded it. *Elyea*, 631 F.3d at 857 (quoting *Farmer*, 511 U.S. at 834). This case presents medical and non-medical Defendants. Although the subjective element applies to both, different factors are considered when determining whether a sufficiently culpable state of mind existed. The summary judgment evidence demonstrates that neither group of Defendants acted with deliberate indifference.

*Dr. Zhang, Dr. Ghosh, and Physician's Assistant Williams*

With respect to the Dr. Zhang, Dr. Ghosh, and Physician Assistant Williams, "[a] medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have so responded under those circumstances." *Sain v. Wood*, 512 F.3d 886, 894–95 (7th Cir.2008) (*Sain*) (internal quotation marks omitted); *see also Elyea*, 631 F.3d at 857. As noted in *Elyea*, "[t]he burden is high on a plaintiff making such a claim: 'Deliberate indifference

is not medical malpractice; the Eighth Amendment does not codify common law torts.'" *Elyea*, 631 F.3d at 857, quoting *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008). Although a successful plaintiff need not "show that he was literally ignored," and evidence that "a plaintiff received 'some' treatment does not resolve the issue conclusively," *Elyea*, 631 F.3d at 857-58 (quoting *Greeno*, 414 F.3d at 653-54), "[a] medical professional acting in his professional capacity may be held to have displayed deliberate indifference only if the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Elyea*, 631 F.3d at 857, (quoting *Sain*, 512 F.3d at 894-95).

In this case, Plaintiff cannot show deliberate indifference by Dr. Zhang. Although the parties dispute whether Dr. Zhang successfully reduced Plaintiff's shoulder back into place on March 9, 2010, Plaintiff admits that Dr. Zhang attempted to reduce the shoulder on that day and ordered an x-ray. The x-ray taken on March 15, 2010, was negative. (R. 75, Exh. E, 3/15/10 x-ray report.) Although the parties again dispute what Dr. Zhang prescribed for Plaintiff at his March 24 and April 2, 2010, visits (whether she prescribed range of motion exercises, less weight lifting, and increased dosage of medication as indicated on the 3/24/10 Progress Note entry), there is no dispute that Dr. Zhang followed up with Plaintiff at least twice after his initial visit, examined him, and discussed Plaintiff's condition and the fact that his March 15th x-ray was negative. (Pl. Depo. at 45.)

"[T]he Constitution is not a medical code that mandates specific medical treatment." *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008). Plaintiff's claims against Dr. Zhang "[a]t best ... allege[] a disagreement with [a] medical professional[] about his needs," which "does not state a cognizable Eighth Amendment claim." *Ciarpaglini v. Saini*, 352 F.3d 328, 331 (7th Cir. 2003).

Even if Dr. Zhang unsuccessfully reduced Plaintiff's shoulder and misdiagnosed that the shoulder was no longer dislocated (which neither the 3/15/10 x-ray nor her later examinations indicated), "[m]edical malpractice in the form of an incorrect diagnosis or improper treatment does not state an Eighth Amendment claim." *Gutierrez v. Peters*, 111 F.3d 1364, 1374 (7th Cir. 1997) (*Gutierrez*); *see also Walker v. Peters*, 233 F.3d 494, 499 (7th Cir. 2000) (*Walker*) ("A doctor might be careless . . . , and this carelessness may constitute malpractice. But malpractice alone is not enough to meet the constitutional standard.").

Plaintiff may understandably be upset if his shoulder was not properly reduced and that he was not immediately sent to a "bone specialist," but the evidence of Dr. Zhang's treatment, examinations, and ordering of x-rays, even if unsuccessful in curing Plaintiff's dislocated shoulder, demonstrates, at most, negligence or malpractice, but not deliberate indifference.

As to Physician Assistant Williams, the evidence indicates that she examined Plaintiff only once on April 15, 2010, following an incident when he was knocked down either while playing basketball or while watching a basketball game from the sidelines. Although the parties dispute the information Plaintiff relayed to Williams, there is no dispute that she examined him, noted complaints about his shoulder, prescribed pain medication, and scheduled him for another x-ray. (R. 69, Defs. SOF ¶¶ 15-18; R. 81, Pl. SOF ¶¶15-18.) Even if Williams provided inadequate treatment or should have done more, her actions, like Dr. Zhang's discussed above, at most amounted to negligence, but not deliberate indifference. *See Elyea*, 631 F.3d at 857-58; *Gutierrez*, 111 F.3d at 1374; *Walker*, 233 F.3d at 499.

The same conclusion must be reached for Dr. Ghosh. The summary judgment evidence shows that he examined Plaintiff on July 7, 2010,[2] at which time he reviewed the April 27, 2010 x-ray that showed a mild separation, prescribed Naproxen and a lower bunk permit, and recommended that Plaintiff see a UIC orthopedist. Plaintiff disagrees with whether he was treated by Dr. Ghosh because, like Dr. Zhang, he was not a "bone specialist." Nonetheless, Dr. Ghosh's actions cannot be considered deliberate indifference. *See Elyea*, 631 F.3d at 857-58; *Gutierrez*, 111 F.3d at 1374; *Walker*, 233 F.3d at 499.

For the reasons stated above, Dr. Zhang, Dr. Ghosh, and Physician Assistant Williams are entitled to summary judgment for Plaintiff's claims of deliberate indifference. To the extent Plaintiff asserts negligence and medical malpractice against these Defendants, (*see* Compl. at 8-9, although Plaintiff's complaint focuses on claims of deliberate indifference in his complaint, he additionally alleges that the medical defendants were negligent), such claims are dismissed without prejudice to Plaintiff bringing them in state court. "Generally, when a court has dismissed all the federal claims in a lawsuit before trial, it should relinquish jurisdiction over supplemental state law claims rather than resolve them on the merits." *Cortezano v. Salin Bank & Trust Co.*, 680 F.3d 936, 941 (7th Cir. 2012) (citing *Miller v. Herman*, 600 F.3d 726, 738 (7th Cir. 2010)). If Plaintiff wants to proceed with his medical malpractice claim, he must do so in state court. *See* 735 ILCS 5/13-217 (Illinois

---

[2] Although not addressed by the parties in their Rule 56.1 Statements, Plaintiff stated in his deposition that Dr. Ghosh participated in, at least in the initial part of the March 9, 2010 examination on the day Plaintiff first injured his shoulder but did not fully examine him until July 7, 2010. (R. 75, Exh. D., Pl. Depo at 14-15, 76-77.) Plaintiff also stated that he wrote letters to Dr. Ghosh in May, and possibly June, of 2010; however, Plaintiff acknowledged that letter writing, as opposed to submitting request for medical care slips, was not the proper procedure for seeking treatment. (*Id.* at 71-76.) Plaintiff's alleged letters to Dr. Ghosh are not in the record. The record thus indicates that Dr. Ghosh did not know of Plaintiff's condition, at least not his post-March 9, 2010 condition, until the July 7 examination.

law allows a claimant one year to refile in state court a *claim* dismissed "for lack of jurisdiction" by a federal court); *Srail v. Village of Lisle*, No. 07 C 2617, 2008 WL 4876865, 9 (N.D. Ill. 2008) (Kennelly, J.); *see also Timberlake v. Illini Hosp.*, 676 N.E.2d 634, 636-37 (Ill. 1997) (refusal by federal court to exercise supplemental jurisdiction over a pendent state-law claim after dismissal of federal claims is considered a dismissal for lack of jurisdiction).

*Warden Hardy and Assistant Warden Osborne*

As to Warden Hardy and Assistant Warden Osborne, Plaintiff must be able to demonstrate (similar to the medical Defendants) that Hardy and Osborne acted with "a sufficiently culpable state of mind." *Greeno*, 414 F.3d at 653 (quoting *Farmer*, 511 U.S. at 834). "They must [have] know[n] of the serious risk to the prisoner's health, i.e., the serious medical need at issue, and they must also [have] consciously disregard[ed] that risk/need so as to inflict cruel and unusual punishment upon the prisoner." *Johnson v. Doughty*, 433 F.3d 1001, 1010 (7th Cir. 2006) (*Johnson*).

With respect to Hardy, the allegations that he was aware of Plaintiff's shoulder condition yet disregarded it is based on four communications to Hardy: (1) Plaintiff's March 24, 2010 emergency grievance, stating that he had not received the report of his March x-ray and that his shoulder was still dislocated; (2) a March 28, 2010 handwritten note from Plaintiff to Hardy, requesting that his shoulder be "relocated" or that he be sent to an outside orthopedic specialist; (3) a letter dated April 2, 2010, from Plaintiff's criminal attorney, Frederick Cohn, requesting that Plaintiff receive the results of his March 2010 x-ray and medical assistance to "relocate" Plaintiff's shoulder; and (4) a May 20, 2010, letter from Cohn, stating that he had not heard a response to his April 2 letter. (R. 75, Ex. G-K.)

At the time of the March 24, March 28, and April 2 grievances and letters, Hardy's review of the medical records would have revealed the following: Plaintiff's shoulder was reduced on March 9, 2010; he had a full range of motion and no swelling at that time; his March 2010 x-ray was negative; the x-ray results were discussed with Plaintiff on March 24, 2010; he was prescribed range of motion exercises and told to engage in less weight lifting; and Plaintiff was again examined on April 2, 2010, at which time there were no acute changes. (R. 69, Exh. A.) The March 24, 2010 emergency grievance (the allegations of which Cohn's April 2, 2010 letter simply repeats) apparently preceded the March 24, 2010 visit with Dr. Zhang, as the grievance does not mention the March 24 visit. By the time the grievance was reviewed, whether by Hardy or his designee, the issue of Plaintiff's learning the results of his x-ray had been resolved. As to Plaintiff's statements that his shoulder was still dislocated, such contentions were belied not only by Dr. Zhang's Progress Notes of her treatment and examination of Plaintiff on at least three occasions between March 9 and April 2, 2010, but also by the March 15, 2010 x-ray, which was negative. As to the May 20, 2010 letter from Plaintiff's attorney, it simply sought a response to his previous April 2, 2010 letter but indicated no change in Plaintiff's condition or new complaints by Plaintiff since the prior letter.

As a non-medical prison official, Hardy was entitled to rely upon medical personnel's treatment of Plaintiff's injury.

> If a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands. This follows naturally from the division of labor within a prison. Inmate health and safety is promoted by dividing responsibility for various aspects of inmate life among guards, administrators, physicians, and so on. Holding a non-medical prison official liable in a case where a prisoner was under a physician's care would strain this division of labor.

*Greeno,* 414 F.3d at 656 (quoting *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004)); *see also Johnson*, 433 F.3d at 1011 at n.9 (also quoting *Spruill* for the proposition that a non-medical prison official cannot be charged with the "scienter requirement of deliberate indifference" where prison doctors were treating and caring for the prisoner unless the official had "reason to believe (or actual knowledge) that prison doctors . . . [we]re mistreating (or not treating) a prisoner.)

Given the medical evidence at the time of Plaintiff's letters and grievances to Hardy, no reasonable juror could find that Hardy acted with deliberate indifference.

Additionally, Hardy cannot be found to have been deliberately indifferent to Plaintiff's condition given that the summary judgment evidence shows that he did not know of the condition. Although Plaintiff and his attorney wrote letters and grievances to Hardy, there is no indication that he, himself, as opposed to his designee, saw such correspondence. Hardy states in a declaration that he did not see the March 24, 2010 emergency grievance; that his designee reviewed the grievance, signed Hardy's name, and placed his initials next to it; and that Hardy never saw the letters from Plaintiff or his attorney. (R. 75, Exh. F at ¶¶ 7-9.) Plaintiff is arguably correct that such a defense is a "slick way" to avoid liability. (R. 82, Pl. SOF ¶ 13.) Nevertheless, the requisite state of mind for deliberate indifference requires actual knowledge. "[I[t is not enough for the inmate to show that the official . . . should have known about the risk. . . . Instead, the inmate must show that the official received information from which the inference could be drawn that a substantial risk existed, and that the official actually drew the inference." *Townsend v. Fuchs*, 522 F.3d 765, 773 (7th Cir. 2008), (citing *Pierson v. Hartley*, 391 F.3d 898, 902 (7th Cir. 2004)).

Allegations that grievances and letters were forwarded to Hardy were sufficient for Plaintiff's claim to proceed on initial review of his Complaint; however, at the summary judgment

stage, Plaintiff "need[s] to offer some record evidence that, because of the purported letters, [Hardy] knew of a constitutional deprivation and approved it, turned a blind eye to it, failed to remedy it, or in some way personally participated." *Vance v. Peters*, 97 F.3d 987, 994 (7th Cir. 1996) (citing *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995)). Plaintiff has not offered such evidence. His only response to Hardy's explanation that he had not seen Plaintiff's grievance and letters is that the explanation is a "slick way" to avoid liability. Though perhaps true, Plaintiff has offered no evidence that Hardy saw or read Plaintiff's correspondence. For both reasons stated above, summary judgment must be granted for Hardy.

As to Assistant Warden Osborne, Plaintiff alleges that he personally spoke to Osborne on March 28, 2010, that he wrote to Osborne that day, and that he saw Osborne again a few days later. At both encounters, Plaintiff and Osborne allegedly discussed that Plaintiff's shoulder was still dislocated and that he needed medical attention. The fact that Plaintiff was again examined by Dr. Zhang on April 2, 2010, suggests that Osborne either arranged for such an appointment or, upon checking Plaintiff's medical records, saw that such an appointment had already been made. Both scenarios indicate no deliberate indifference.

Regardless whether Osborne caused the April 2 visit to occur or saw that the appointment had been made, he is still entitled to summary judgment for the same reasons stated for Hardy. Had Osborne checked Plaintiff's medical records at the time of Plaintiff's conversations with Osborne, he would have seen that Plaintiff's shoulder was successfully reduced on March 9, 2010; that an x-ray taken several days later was negative, and that Plaintiff had follow-up visits with Dr. Zhang. Osborne was entitled to rely upon these medical records. *Greeno,* 414 F.3d at 656; *Johnson*, 433 F.3d at 1011 at n.9. Even though Osborne, by personally viewing Plaintiff's shoulder, arguably had "reason to believe (or actual knowledge) that prison doctors . . . [we]re mistreating (or not treating)"

Plaintiff, *see Johnson*, 433 F.3d at 1011 at n.9, the March 2010 medical records belie any contention that Osborne consciously disregarded Plaintiff's medical condition. *Id.* at 1010. Given Dr. Zhang's Progress Notes, indicating that the shoulder was successfully reduced, a fact apparently supported, if not confirmed, by the March 15, 2010 x-ray, this is not "the unusual case where it would be evident to a layperson that a prisoner [wa]s receiving inadequate or inappropriate treatment." *Id.* at 1011 (quoting *Bond v. Aguinaldo*, 228 F. Supp. 2d 918, 920 (N.D. Ill. 2002)). Accordingly, summary judgment must be granted for Osborne.

## CONCLUSION

For the reasons stated in this opinion, Defendants' motions for summary judgment [68, 73] are granted. Plaintiff's claims of deliberate indifference are dismissed with prejudice. Plaintiff's state-law claims of negligence or malpractice against Defendants are dismissed for lack of jurisdiction and without prejudice to Plaintiff's bringing them in state court. Plaintiff's motions in opposition to Defendants' summary judgment motions [78, 80] are denied; though these motions were considered, along with his responses to the summary judgment motions. This case is closed.

Date: <u>February 27, 2013</u>

_____
JOHN W. DARRAH
United States District Court Judge